A05A1430. ANDREWS v. THE STATE.
(620 SE2d 629)

MIKELL, Judge.

Ospen Andrews appeals from his aggravated stalking, burglary, aggravated assault, and false imprisonment convictions,[1] contending that: (1) insufficient evidence supports his burglary, aggravated assault, and false imprisonment convictions; (2) the trial court erred by refusing additional voir dire questions; and (3) he received ineffective assistance of counsel. We affirm for the reasons set forth below.

On appeal, we must view the evidence

in the light most favorable to the verdict and the appellant no longer enjoys the presumption of innocence; moreover, on appeal this court determines evidence sufficiency and does not weigh the evidence or determine witness credibility.

(Citation and punctuation omitted.) *Williams v. State*, 217 Ga. App. 636, 638 (3) (458 SE2d 671) (1995). Because this is a case in which the victim recanted at trial and the state proved its case through her inconsistent pre-trial statements, a detailed summary of the trial testimony follows.

Before the incident at issue in this appeal, the victim accused Andrews, her ex-boyfriend, of raping her in Fulton County. When she first reported the crime to the police, the victim was very afraid of Andrews and seemed visibly shaken as though she had been through

---

[1] Andrews was also charged with making terroristic threats and theft by taking. The jury found him not guilty of theft by taking and was unable to reach a unanimous verdict on the terroristic threats charge.

a trauma. At the hospital, she reported that Andrews had kicked in the door of her apartment, punched her in the face, tied her up with a telephone cord, had intercourse with her, attempted to have anal intercourse and oral sex with her, and ejaculated on her face and forehead. Andrews then forced the victim to go with him for a ride. After the victim made a surreptitious phone call to police about her location, they apprehended Andrews. A doctor who examined the victim at the hospital testified that she had a cut lip, cuts around her ankle that appeared to be the impression of a phone cord, and seminal fluid on her face and around her hairline.

After Andrews' arrest, the victim moved to an apartment in DeKalb County. When Andrews was later released on bond for the Fulton County charges of kidnapping and rape, one of the conditions of his release was that he have no contact with the victim.

Less than one month after Andrews was released on bond, he called a friend of the victim, City of Atlanta Police Officer Jarvis Jackson, and told him that he had taken the victim to the hospital because she had fallen out of the third-floor window of her apartment while they were joking and playing around. Jackson drove to the hospital and saw the victim in the emergency room. The victim's eyes were swollen shut, her lips were swollen, and she had cuts and bruises on her face, arms, and legs.

Andrews had already left when Jackson arrived, and the victim told Jackson that she had jumped out of her apartment window because she was afraid of Andrews. The victim explained to Jackson that she had not been staying in her apartment because she was afraid, but went there to get a book. When she arrived, Andrews was waiting for her; he had kicked in the door of the apartment and then placed it so that it would appear normal. Andrews told her that he planned to take her to the basement of a friend's house and allow his friends "to do whatever they wanted to do with her" so that she would "understand how it felt to be in prison like a dog." When Andrews told her that the friends were on their way to pick her up, the victim jumped out the third floor window. Andrews then picked her up and took her to the hospital.

After the victim was released from the hospital, Jackson went with her to her apartment to meet with DeKalb County police. The police saw that her door had been kicked in and that her wood furniture had been slashed and scratched. The victim told police that Andrews had caused the damage.

A DeKalb County police officer testified that the victim told him that when she returned to the apartment and found Andrews, she used her pepper spray on him and tried to escape. When her escape effort failed, Andrews forced her into her bedroom and would not let her leave. After several hours, Andrews told her his friends were

coming and that they planned to lock her in a basement for several months to teach her a lesson. When the victim tried to escape by climbing out of the third floor window, she fell.

The victim gave a signed, written statement to a DeKalb County detective in which she provided more details about her ordeal. She explained that when she arrived at her apartment, she discovered damage to her furniture and Andrews walked out of the bedroom. She tried to spray him with pepper spray, but he choked her from behind, resulting in her spraying them both. He took her to the bathroom where he flushed both of their skin with cold water and blocked the exit to the bathroom. He then told her to sit in the kitchen while he made dinner. He threatened to kill her if she screamed or tried to leave. When the victim felt sick as a result of the pepper spray, he called the hospital and received instructions to give her fresh air and a cold shower. After she showered under Andrews' supervision, she sat on the window sill in the bedroom. Andrews then told her his friends were coming with a gun and they planned to lock her in a basement for two months so she would know what it felt like to be in jail. He told her he planned to tie her up so that he could sleep until his friends arrived and denied her request for five more minutes of fresh air because he did not want her to yell out the window for help. When he got off the bed and moved toward her, she jumped out the window. He grabbed her shirt and she hung suspended in the air until her shirt ripped and she fell. He came outside and she tried to fight him off with a stick, but he picked her up and took her to the hospital.

The victim testified at trial that Andrews was her current boyfriend and that she was testifying only because she had been subpoenaed. She admitted that they broke up before the Fulton County incident, but denied that he kicked the door in, hit her in the face, tied her up, raped or kidnapped her when she lived in Fulton County. She admitted calling Jackson and telling him that Andrews had raped her, but claimed she made it up to force Andrews to get help for his severe depression. She claimed seminal fluid got on her face because the phone rang while Andrews was ejaculating during sex and he pulled out to answer the phone and semen got on her face when he hopped up onto the bed.

With regard to the incident in DeKalb County, the victim claimed that Andrews was living with her there, that the mace went off accidentally, that they called the hospital for advice, that she sat on the bedroom window sill to get some air and accidentally fell out of it, and that Andrews did not threaten her in any way. She explained that she gave a written statement to the contrary because she was angry at Andrews for calling the police and her mother about her fall, which meant that she would have to live with her parents.

The victim acknowledged that there was an open air front porch on her apartment where she could have obtained fresh air. She acknowledged that Andrews was her first love and that he was mentally, but not physically abusive. She acknowledged writing to the police that she "fit the typical profile of an in-denial female in an abusive relationship," but claimed she only wrote this to satisfy her mother and therapist so that she could return to Atlanta and be near Andrews.

The victim acknowledged allowing a detective to hear tape recorded messages left by Andrews on her cell phone as part of her effort to get him some help for his depression. In these messages, Andrews called the victim a whore and a bi***, threatened to beat the f*** out of her, threatened to kill her, and told her that she better run or hide because he was going to whup her a**. Many of these messages were left on the day on which the victim reported she had been raped.

Andrews testified and denied committing the offenses with which he was charged. He acknowledged leaving the messages on her cell phone, but explained them as a joke. He admitted that he fled the state two months after the DeKalb County incident because he was scared and did not want to be arrested. He also admitted scratching her furniture because he "didn't have nothing to do" and "cut it just to be doing something."

1. In related enumerations of error, Andrews contends insufficient evidence supports his convictions because the victim changed her story at trial and stated that she had made up her allegations against Andrews. It is well settled, however, that "[t]he jury, not this Court, resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from the evidence." (Citation omitted.) *Strong v. State*, 265 Ga. App. 257, 258 (593 SE2d 719) (2004). This is true even in cases in which the victim recants her previous accusation against the defendant. See *Woodford v. State*, 240 Ga. App. 875, 876 (525 SE2d 408) (1999); *Kirby v. State*, 187 Ga. App. 88, 89 (1) (369 SE2d 274) (1988). The reason for this rule is that a victim's prior inconsistent statements are admissible as substantive evidence for the jury's consideration. *Kirby*, supra. Thus, a "jury [is] authorized to believe the victim's pre-trial statements rather than her in-court disavowal." *Lee v. State*, 250 Ga. App. 110, 111 (1) (550 SE2d 696) (2001). In this case, a rational trier of fact could have found that the victim recanted her pre-trial outcry statements based on her self-described status as his current girlfriend, the abusive nature of their relationship, or even out of fear of retaliation from Andrews. Sufficient evidence, therefore, supports Andrews' convictions under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In his second enumeration of error, Andrews contends the trial court should have allowed him additional voir dire of all jurors after one juror stated she was "slightly intimidated" by a tattoo on Andrews' forehead. "The conduct of the voir dire examination of prospective jurors is within the sound discretion of the trial court, and upon review this court will reverse that judgment only in the event of manifest abuse of that discretion." *Watkins v. State*, 191 Ga. App. 87, 90 (5) (381 SE2d 45) (1989).

The record shows that at the beginning of voir dire, the trial court asked the panel the following questions, to which no juror responded affirmatively:

> [Is there] any member who, at this point, even before you've heard evidence in this case, has for any reason formed and expressed an opinion regarding the guilt or innocence of this defendant?
>
> Is there any member of our jury panel at this time that has any prejudice or bias resting on your mind either for or against the defendant?
>
> Is there any member of the panel who cannot state to this court that at this time your mind is perfectly impartial between the state and the defense, that is, at this point you feel that you don't have any biases one way or the other, you're impartial?

When the trial court asked, "[h]aving said all of that, is there any member of this panel who, for any other reason, feels that you could not serve as a fair and impartial juror?," two jurors responded that they could not and these jurors were excused.

The court then allowed counsel for the parties to ask the panel general questions. Defense counsel's last questions, which received no affirmative response, were "do any of you believe, as we begin this trial, that it's necessary that he must be guilty of something? Anyone feel that Mr. Andrews must have done something wrong, must be guilty of something?"

The trial court then placed the potential jurors in the jury box in groups of 12 for individual questioning. When Juror No. 33 was questioned individually, she responded as follows to one of the state's questions:

> Q. Is there anything that you haven't been asked that you feel we should know about your ability to serve on this jury?
> A. I'm just slightly intimidated by the marking on his forehead.
> Q. Okay. Intimidated, you mean you're afraid of him or —

A. Not necessarily afraid, but I think it's giving me some preconceived notions about him, and it may not be true, but —

Q. Do you feel you would be able to set aside any preconceived notions you have and be a fair and impartial juror?
A. I think I'm a little biased by it.

Andrews' attorney did not ask this juror any questions and asked no questions about the mark when three jurors were individually questioned after Juror No. 33. All of the jurors actually seated on the jury were individually asked a question similar to the one which elicited the "mark" comment by Juror No. 33. None of them made a similar response.

At the conclusion of voir dire, the trial court struck Juror No. 33 for cause as requested by defense counsel with no objection by the state. At the time the trial court struck the juror, the following transpired outside the presence of the jury:

THE COURT: What is she talking about, marks on his forehead? I'm not even sure what she is talking about.
[DEFENSE COUNSEL]: Well, there's a cross on his forehead, judge.
THE COURT: Between his eyes?
[DEFENSE COUNSEL]: Yes.
THE COURT: I can't see it from here. She must have good vision.
[DEFENSE COUNSEL]: Judge, we do have some concerns as to that issue, also. I don't know if you would like me to address them now. But I believe now, one, we have concerns as to whether the jury has been tainted by that comment, as to whether they're now going to look and have some concerns, due to the fact she had concerns.
Did she know something about the cross on the forehead that none of the other jurors know? I would have liked an opportunity to either, A, pick a whole new jury,[2] or, B, question the jury as to whether they are now biased against my client due to markings that he may have on his body.
THE COURT: Well, the markings he has on his body have been there since this jury has come in the courtroom, and I believe the jury has been thoroughly questioned regarding

---

any areas of bias, so I'm not going to go back and bring that up.

OCGA § 15-12-133 provides for a broad scope of examination

> touching any matter or thing which would illustrate any interest of the juror in the case, including . . . any fact or circumstance indicating any inclination, leaning, or bias which the juror might have respecting the subject matter of the action or the counsel or parties thereto.

In this case, defense counsel expressed a desire to ask the individual jurors, some of whom may have overheard Juror No. 33's remarks, whether they were biased against his client as a result of the mark on his forehead. This request, however, was only made after voir dire was complete and several jurors had already been struck for cause. We further note that defense counsel had the opportunity to ask three jurors who were individually questioned after Juror No. 33 about Andrews' mark and failed to do so. As Judge Birdsong pointed out in his special concurrence to *Sanders v. State*, 204 Ga. App. 37 (419 SE2d 24) (1992),

> if counsel reasonably expected to establish bias on the part of an individual juror he should have asked follow-up probative questions, at least until he was definitively prohibited from conducting an effective inquiry into the area by the trial court. "The failure to timely exercise due diligence in the voir dire waived the right to assert this allegation of error." *Thurmond v. Bd. of Commrs. of Hall County*, 174 Ga. App. 570, 571 (2) (330 SE2d 787) [(1985)].

Id. at 42. Additionally, even if we were to find Andrews' counsel timely requested the opportunity to conduct individual voir dire into this issue, no harmful error resulted from the trial court's prohibition of it. All of the selected jurors were individually asked an open-ended question similar to the one which elicited the fact that Juror No. 33 was intimidated by the mark on Andrews' forehead and none of them expressed a similar bias. See *Cherry v. State*, 230 Ga. App. 443, 444 (1) (496 SE2d 764) (1998) ("the action of the trial court in forbidding this single question was harmless error in light of the other questions to the venire which explored the issue"). And, the trial court noted that it could not even see the cross that "slightly intimidated" Juror No. 33. As a result, no reversible error resulted from the trial court precluding further voir dire by defense counsel.

3. In his remaining enumeration of error, Andrews contends that he received ineffective assistance of counsel because his lawyer: (a) failed to object to the state's introduction of evidence about the prior rape and kidnapping in Fulton County; and (b) failed to interview potential defense witnesses.

> The two-prong test for determining the validity of a claim of ineffective assistance of counsel provided in *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984), asks whether counsel's performance was deficient and, if so, whether this deficiency prejudiced the defense; that is, whether there is a reasonable probability that the outcome of the proceedings would have been different, but for counsel's deficiency.

(Punctuation omitted.) *Bruce v. State*, 252 Ga. App. 494, 498 (2) (555 SE2d 819) (2001). "A trial court's finding that a defendant has not been denied effective assistance of trial counsel will be affirmed unless clearly erroneous." (Citations and punctuation omitted.) *Scapin v. State*, 204 Ga. App. 725 (420 SE2d 385) (1992). Finally,

> [a]lthough the Supreme Court in *Strickland* discussed the performance component prior to the prejudice component, it acknowledged that a court addressing the ineffective assistance issue is not required to approach the inquiry in that order or even to address both components if the defendant has made an insufficient showing on one.

*Lajara v. State*, 263 Ga. 438, 440 (3) (435 SE2d 600) (1993).

(a) We find no merit in Andrews' claim that his counsel was ineffective for failing to object to the evidence about the Fulton County incidents. The record shows that the state notified Andrews that it intended to use the incidents as evidence of either similar transaction or prior difficulties between the parties. Before the start of trial, the state also informed the trial court of its intent to introduce this evidence. The trial court ruled, with no objection from defense counsel, that this evidence would be admissible based on the aggravated stalking charges against Andrews. In the motion for new trial hearing, Andrews' trial counsel testified that he did not object, because, in his opinion, it was admissible as evidence of prior difficulties between the parties.

We agree with trial counsel's conclusion. "[E]vidence of the defendant's prior acts toward the victim[,] be it prior assault, a quarrel, or a threat[,] is admissible when the defendant is accused of

a criminal act against the victim." (Punctuation and footnote omitted.) *Cunningham v. State*, 243 Ga. App. 770, 771 (1) (533 SE2d 735) (2000) (evidence of prior batteries of the victim admissible in rape case). As a result, trial counsel's performance was not defective and the trial court properly denied this claim of ineffectiveness.

(b) Andrews contends his counsel was also ineffective for failing to interview two witnesses involved in the Fulton County incident. However, Andrews submitted no evidence in the new trial hearing demonstrating how any information possessed by these witnesses would have helped his defense. "Absent [such] a proffer, defendant cannot meet his burden of making an affirmative showing that specifically demonstrates how counsel's failure would have affected the outcome of his case." (Citation and punctuation omitted.) *Sanders v. State*, 253 Ga. App. 380, 382 (559 SE2d 122) (2002). Because Andrews failed to demonstrate any prejudice resulting from his counsel's failure to interview the witnesses, the trial court properly denied this ground of his ineffectiveness claim.

*Judgment affirmed. Andrews, P. J., and Phipps, J., concur.*

DECIDED SEPTEMBER 8, 2005.

*Carla J. Friend*, for appellant.

*Gwendolyn Keyes Fleming, District Attorney, Robert M. Coker, Assistant District Attorney*, for appellee.